## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| VOXTUR ANALYTICS CORP., *et al.*[1] | Case No. 25-11996 |
| Debtors in a foreign proceeding. | (Joint Administration Pending) |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND RELATED RELIEF

Voxtur Analytics Corp., in its capacity as the authorized foreign representative (the "Foreign Representative") appointed in the Canadian insolvency proceeding of itself and its direct and indirect subsidiaries (collectively, the "Debtors"), *In the Matter of a Plan of Compromise or Arrangement of Voxtur Analytics Corp., et al.*, Ontario Supreme Court of Justice, Court File No. CL-25-00753573-0000 (the "Canadian Proceeding"), by and through its counsel, Ballard Spahr

---

[1] The Debtors in these Chapter 15 Cases, along with the last four digits of their federal tax identification numbers or other unique identifier are: Voxtur Analytics Corp., an Ontario corporation (8993); Appraisers Now Ltd., an Alberta limited company (7171); Appraisers Now US, LLC, a Delaware limited liability company (8411); Blue Water Financial Technologies Holding Company, LLC, a Minnesota limited liability company (6970); Blue Water Financial Technologies Services, LLC, a Minnesota limited liability company (1646); Blue Water Financial Technologies, LLC, a Delaware limited liability company (1901); Clarocity Inc., a Delaware corporation (2105); Commonwealth USA Settlements, LLC, a Pennsylvania limited liability company (6173); iLOOKABOUT (US) Inc., a Delaware corporation (9588); iLOOKABOUT Inc., an Ontario corporation (8046); Legend Title Company, LLC, a Colorado limited liability company (6134); MTAG Paralegal Professional Corporation, an Ontario corporation (7698); MTE Paralegal Professional Corporation, an Ontario corporation (7210); Municipal Tax Equity Consultants Inc., an Ontario corporation (9627); Orange & Blue Holdings 3.0, LLC, a Florida limited liability company (6022); Orange & Blue Holdings 4.0, LLC, a Florida limited liability company (1696); Orange & Blue Holdings 5.0, LLC, a Florida limited liability company (0278); Valuation Vision Inc., a California corporation (5555); Voxtur Analytics US Corp., a Delaware corporation (1392); Voxtur Settlement Services of Alabama, LLC, an Alabama limited liability company (1630); Voxtur Settlement Services of Arkansas, LLC, an Arkansas limited liability company (4979); Voxtur Settlement Services, LLC, a Florida limited liability company (9303); Voxtur Technologies US, Inc., a Delaware corporation (2142); Voxtur Title Agency, LLC, a Delaware limited liability company (1965); and Voxtur Valuation, LLC, a Kansas limited liability company (8633). The Foreign Representative's mailing address is: 543 Ridout Street North, London, Ontario, N6A 2P8.

LLP, respectfully submits this *Verified Petition for Recognition of Foreign Main Proceeding and Related Relief* (the "Verified Petition"), together with the Official Form 401 *Chapter 15 Petition for Recognition of a Foreign Proceeding* (the "Form Petition") [D.I. 1], and requests entry of an order recognizing the Canadian Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. §§ 1517(b)(1) and 1502(4) and granting additional relief pursuant to 11 U.S.C. § 1521 to preserve and administer the Debtors' assets located in the United States.

## PRELIMINARY STATEMENT

1.      The Foreign Representative, Voxtur Analytics Corp. ("Voxtur"), together with its direct and indirect subsidiaries (collectively, the "Voxtur Group" or the "Company"), is a Canadian-based real estate technology company that operates in Canada and the United States. The Company develops and provides technology platforms and related services that support property valuation, tax assessment, title and settlement, and mortgage capital markets activities.

2.      On November 10, 2025, the Debtors commenced the Canadian Proceeding under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"), pursuant to the Initial Order entered in the Canadian Proceeding [D.I. 1, Attachment 4] (the "Initial Canadian Order"), and the Debtors anticipate that a final Amended and Restated Initial Order will be entered in the Canadian Proceeding following a hearing on November 20, 2025 (together, the Initial Canadian Order and the Amended and Restated Initial Order are referred to herein as the "Canadian Order").

3.      On November 11, 2025 (the "Petition Date"), the Foreign Representative commenced these Chapter 15 cases (these "Chapter 15 Cases"), and is petitioning this Court pursuant to 11 U.S.C. § 1515 for recognition of the Canadian Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. § 1517, so that the Foreign Representative can obtain legal

authority and control over the Debtors' assets located in the United States, so as to avoid loss and maximize the potential return to the Debtors' creditors everywhere.

4.     By this Verified Petition, the Foreign Representative requests that this Court recognize the Canadian Proceeding as a "foreign main proceeding" because (i) the Canadian Proceeding is pending in the country where the Debtors' "center of main interest" is located; (ii) the Canadian Proceeding is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23); (iii) the Foreign Representative is a "foreign representative" within the meaning of 11 U.S.C. § 101(24); and (iv) all other requirements for Chapter 15 recognition are satisfied by the Form Petition and this Verified Petition (together, the "Petition").

## JURISDICTION & VENUE

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a) and (b).

6.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P), and the Court may enter a final order in respect of it under Article III of the United States Constitution.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) because the Debtors' principal assets in the United States are located in Delaware.  Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1410(2) because certain Debtors are parties to litigation pending in this District.  Case No. 1:25-cv-742-GBW-SRF.  Further, venue is proper in this District pursuant to 28 U.S.C. § 1410(3) because venue here will be consistent with the interests of justice and the convenience of the parties having regard to the relief sought by the Foreign Representative.

8.     The Debtors are eligible to be debtors under Chapter 15 pursuant to 11 U.S.C. §§ 109(a) and 1501(b) because the Debtors have real and personal property in the United States,

and the Foreign Representative is a foreign representative for the Debtors seeking assistance in the United States in connection with a foreign proceeding.

9.     These Chapter 15 Cases were properly commenced pursuant to 11 U.S.C. §§ 1504 and 1509(a) by the Foreign Representative filing the Petition, applying to this Court pursuant to 11 U.S.C. § 1515 for recognition of the Canadian Proceeding as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1).

10.     The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 1504, 1509, 1515, 1517, 1520, and 1521.

<u>**STATEMENT OF FACTS**</u>

A.     <u>**The Debtors**</u>.

11.     The Voxtur Group is a Canadian-based real estate technology company that operates in Canada and the United States.

12.     Prior to a significant merger in 2021, the Company focused on real estate imaging and valuation technologies, but later evolved through several strategic acquisitions into the broader, fully integrated real estate analytics platform it is today.  The Company develops and provides technology platforms and related services that support property valuation, tax assessment, title and settlement, and mortgage capital markets activities.

13.     Voxtur is the public parent company in the Company's corporate structure. Voxtur's shares were traded in Canada on the TSX Venture Exchange (TSX-V) under the symbol VXTR until such time as they were cease-traded on September 5, 2025.  Voxtur's shares were also traded in the United States on the OTCQB under the symbol VXTRF but were de-listed to the Pink Limited Market.

14.     Voxtur was incorporated under the Ontario *Business Corporations Act* on April 1, 2008.  Its registered head office is located in London, Ontario.

15.     Voxtur directly or indirectly owns 100% of all of the Debtors, with the exception of MTAG Paralegal Professional Corporation and MTE Paralegal Professional Corporation (the "Paralegal Corporations").

16.     The Paralegal Corporations are Ontario paralegal professional corporations.  All directors of paralegal corporations must be licensed paralegals (or lawyers) who are in good standing with the Law Society of Ontario (LSO), and who are also shareholders of the corporation.  Voxtur's chairman is a licensed paralegal and the sole director and officer of the Paralegal Corporations.  The Paralegal Corporations were incorporated for the Company to provide specific paralegal services.  The Paralegal Corporations and Voxtur are parties to a management services agreement pursuant to which Voxtur contractually controls the Paralegal Corporations.

17.     The Debtors' respective jurisdictions of incorporation and registered head office locations are as follows:

| Debtor | Jurisdiction |
| --- | --- |
| Voxtur Analytics Corp. | Ontario |
| iLOOKABOUT Inc. | Ontario |
| MTAG Paralegal Professional Corporation | Ontario |
| MTE Paralegal Professional Corporation | Ontario |
| Municipal Tax Equity Consultants Inc. | Ontario |
| Appraisers Now Ltd. | Alberta |
| Appraisers Now US, LLC | Delaware |
| Blue Water Financial Technologies, LLC | Delaware |
| Clarocity Inc. | Delaware |
| iLOOKABOUT (US) Inc. (dba Apex Software) | Delaware |
| Voxtur Analytics US Corp. | Delaware |
| Voxtur Technologies US, Inc. | Delaware |
| Voxtur Title Agency, LLC | Delaware |
| Voxtur Settlement Services of Alabama, LLC | Alabama |
| Voxtur Settlement Services of Arkansas, LLC | Arkansas |
| Valuation Vision Inc. | California |
| Legend Title Company, LLC | Colorado |

| Orange & Blue Holdings 3.0, LLC | Florida |
| Orange & Blue Holdings 4.0, LLC | Florida |
| Orange & Blue Holdings 5.0, LLC | Florida |
| Voxtur Settlement Services, LLC | Florida |
| Voxtur Valuation, LLC | Kansas |
| Blue Water Financial Technologies Holding Company, LLC | Minnesota |
| Blue Water Financial Technologies Services, LLC | Minnesota |
| Commonwealth USA Settlements, LLC | Pennsylvania |

18.     Voxtur's non-Debtor subsidiaries are entities that either have no assets or liabilities, or are not direct subsidiaries of Voxtur.

19.     The Voxtur Group has operations in both Canada and the United States.  Its real estate technology products allow clients to value real property assets, originate and service mortgage loans, securitize portfolios, and evaluate property tax assessments.  The Company's clients include both private and public entities across North America.

20.     The Voxtur Group operates as a single integrated property technology business despite comprising 25 entities across Canada and the United States.  The "one stop solution" concept that the Company offers its client (*i.e.*, providing "end-to-end solutions" covering all aspects of the real estate lifecycle), explains the nature of the combined operations and the high degree of corporate interdependence.  The Company employs proprietary software and data tools to make the buying, selling, financing and managing of real estate assets as seamless, cost-efficient and user-friendly as possible.

21.     The Voxtur Group's business is organized into distinct divisions that address different aspects of the real estate and mortgage lifecycle.  These divisions include (i) Appraisers Now ("ANOW"), which provides appraisal workflow management software; (ii) iLOOKABOUT ("iLOOKABOUT"), which provides real property data related to software, imagery, data and analytics solutions; (iii) Blue Water Financial Technologies ("Blue Water"), which provides digital tools for mortgage asset trading and related risk management functions; and (iv) the

Company also had a U.S. based division that provided title and settlement services ("<u>Title and Settlement Services</u>"), which ranged from traditional residential and commercial sales, to default-related dispositions.

### *ANOW (Appraisers Now).*

22.     ANOW is a software-as-a-service (SaaS) platform used primarily by appraisers, lenders, and appraisal management companies to manage the valuation process.     The lender/appraisal management solution connects directly to a lender's loan origination system and uses a rules-based routing engine to send appraisal orders directly to appraisers.     The platform includes tools for order management, scheduling, compliance tracking, and report delivery, allowing users to monitor and complete appraisal assignments more efficiently.     ANOW's system is cloud-based and is designed to standardize and digitize workflows for the valuation process, which is a requirement in mortgage lending and related financial transactions.

23.     Appraisers Now Ltd. and Appraisers Now US, LLC are the Debtor subsidiaries that operate the ANOW business, own the assets associated with the ANOW business, and employ the individuals who work in this division.

### *iLOOKABOUT.*

24.     iLOOKABOUT provides property data and analytics services used for real property tax assessment, valuation, and related applications.     This division aggregates and maintains property-level data and imagery and offers tools that allow municipalities, lenders, and other users to analyze and validate property characteristics for assessment and taxation purposes. iLOOKABOUT's services are used to assist in property valuation and to support fair and accurate property assessments, which are essential for municipal taxation and mortgage underwriting. iLOOKABOUT (US) Inc. d/b/a Apex Software is the industry leader in floor plan sketching,

offering various sketching products and sketching services which include sketch creation, sketch verification and analysis processes.

25.     iLOOKABOUT Inc. and iLOOKABOUT (US) Inc. are the Debtor subsidiaries that operate iLOOKABOUT's business.  iLOOKABOUT (US) Inc. is wholly owned by the holding company, Clarocity, Inc., which has no other business or assets.

26.     The Paralegal Corporations and Municipal Tax Equity Consultants Inc. ("MTE Consultants") all relate to iLOOKABOUT's tax assessment business.  The Paralegal Corporations provide paralegal services, including representing clients in respect of applications before the Assessment Review Board (ARB) tribunal.  As described above, the Paralegal Corporations are controlled by Voxtur through a contractual arrangement between Voxtur and the sole director of the Paralegal Corporations.

### *Blue Water*.

27.     Blue Water provides technology solutions for participants in the mortgage capital markets, including tools for the valuation, sale, and transfer of mortgage servicing rights and related assets.  The platform includes applications for pricing, risk assessment, and transaction execution in connection with mortgage asset trading.  Blue Water also offers technology-enabled due diligence and compliance review services for mortgage portfolios.  These tools are intended to facilitate the transfer of mortgage-related assets between originators, investors, and servicers in an efficient and standardized manner.

28.     Blue Water Financial Technologies Holding Company, LLC, Blue Water Financial Technologies, LLC, Blue Water Financial Technologies Services, LLC are the Debtor subsidiaries that operate the Blue Water business, own the assets associated with the Blue Water business, and employ the individuals who work in this division.

29.     As described in detail below, the Blue Water business was acquired by Voxtur in 2022, and this aspect of the business is currently the subject of significant litigation in the United States.

### *Title and Settlement Services*.

30.     The Company's Title and Settlement Services division sells title products and e-closing solutions to lenders, asset managers, title agents, brokers, realtors, under-writers and other customers in the United States.  The Title and Settlement Services division is operated by the following U.S.-based Debtor entities: Voxtur Settlement Services, LLC, Voxtur Settlement Services of Alabama, LLC, Voxtur Settlement Services of Arkansas, LLC, Voxtur Title Agency, LLC, Legend Title Company, LLC, Commonwealth USA Settlements, LLC, Orange & Blue Holdings 3.0, LLC, Orange & Blue Holdings 4.0, LLC, and Orange & Blue Holdings 5.0, LLC.

### *Non-Operational Business Divisions*.

31.     Prior to 2022, the Company operated a business line called "Voxtur Valuation and Valuation Vision", which offered valuation services including appraisals, broker price opinions, evaluations, appraisal quality control, consumer inspections and property condition reports.  This business was operated by Valuation Vision, Inc. and Voxtur Valuation, LLC, but is now inactive.

32.     The Company also previously operated "Voxtur Tech" which provided certain real estate technology.  This business division was operated through Voxtur Technologies US Inc.

### *Employees and Payroll*.

33.     Prior to staff reduction measures, which began in April 2025, Voxtur Group had approximately 100 employees throughout North America across various functions, including, among others, project managers, software developers and web application developers, technicians, consultants, paralegals, and accounting and finance staff.

34.     The Voxtur Group currently has 44 employees in Canada.  The headcount of the Canadian entities is as follows: iLOOKABOUT Inc. (23), Voxtur (3), Municipal Tax Equity Consultants Inc. (7), MTAG Paralegal Professional Corporation (5), and Appraisers Now Ltd. (6).

35.     The Voxtur Group currently has approximately 38 employees in the United States. The headcount of the American entities is as follows: Voxtur Analytics US Corp. (9), Blue Water Financial Technologies LLC (3), Blue Water Financial Services, LLC, (14) and iLOOKABOUT (US) Inc. (12).

### *Leased Premises*.

36.     Voxtur's registered head office is located at 543 Ridout Street North, London, Ontario (the "Head Office").  Certain members of the management team in Canada utilize the Head Office space regularly; however, most of the Company's employees work remotely.  The Company does not have a written lease for the current Head Office, and is in the process of moving the Head Office to another location in London, Ontario.

37.     The Debtors do not own any real property.  The Voxtur Group leases five other office spaces as follows (collectively, the "Leased Premises"):

a.     Toronto, Ontario: 175 Bloor Street East, Suite 1105, South Tower.  This is a leased office space where certain members of executive management frequently attend.

b.     Pittsburgh, Pennsylvania: 410 Penn Center West. This is a leased office space that has been vacant since August 2023.

c.     Deephaven, Minnesota: 18258 Minnetonka Boulevard.  This is a leased office space that functions primarily as an office for the Company's Blue Water business.

    d.    Tampa, Florida:  2202 N. Westshore Boulevard.  This is a leased office space used for administrative functions and as a storage space.

    e.    Irving, Texas: 2201 W. Royal Lane.  This is a leased office space that is currently subleased to another tenant.

38.    The Company is current in respect of lease obligations at its offices in Toronto, Tampa, and Irving.  With respect to the Pittsburgh and Deephaven offices, the Company currently owes the respective landlords USD $20,327.76 and USD $74,464 in respect of rent for the months of August, September, October, and November 2025.

39.    As indicated, most employees work remotely.  As a result, the Leased Premises are under-utilized and the Company has been in the process of downsizing, including finding tenants to sublease its office spaces.

### *Cash Management*.

40.    In the ordinary course of business, the Voxtur Group uses a banking and cash management system ("Cash Management System") to, among other things, collect funds and pay expenses associated with its operations.  The Voxtur Group has bank accounts in both the United States and Canada, including eight (8) Canadian bank accounts with BMO and twelve (12) bank accounts in the United States with Valley, BMO Harris Bank, Jefferson Bank, and Wells Fargo, respectively.  The applicable entity and Hale are party to deposit account control agreements (DACA) for each of these accounts.

41.    The Cash Management System is administered by the Company's finance department, headed by the Chief Financial Officer who is located in London, Ontario.  The Cash Management System has several functions, comprised of: (a) collection of accounts receivable from third parties; (b) disbursements to fund payroll, capital expenditures, maintenance costs,

payments to service providers; and (c) intercompany cash transfers among various Debtor entities. Intercompany transfers are made on an "as needed" basis to ensure that each Debtor has sufficient working capital and liquidity to meet its needs.

42.     When cash needs cannot be met through intercompany transfers, funding requests have historically been made directly to the Company's lender.  In the ordinary course, funds are received by the bank account owned by Voxtur Analytics US Corp., and are then transferred as needed to the entities requiring funds.

43.     The Cash Management System and related functions are administered by the respective finance management team in Canada and in the United States.  In the ordinary course, funds are transferred regularly between the Company's accounts based on cash needs.

### *Key Customers and Service Providers.*

44.     The Company's business is reliant on its relationship with key customers and suppliers.  The Company's major clients include a broad range of parties in the real estate, mortgage, valuation and tax industries, both private and public.  The Company's ANOW business line services mainly lenders, mortgage originators and servicers who can use ANOW's technology to support valuation, loan origination, default management and portfolio analytics.  The ANOW business division also provides services to appraisal firms and appraisal management companies (AMCs) through its SaaS platform.  Other key customers include real-estate brokers, agents, investors and title insurers and government agencies, municipalities, or assessment agencies who use the Company's "assessment" and property tax analytics tools.  The nature of the Company's business technology and the specialized real-time solutions that it offers requires reliable and uninterrupted service from its business partners including, among others, property data providers and/or collectors, external appraisers, and legal/compliance services.  Conversely, viewed from a

clientele perspective, seamless operations and continuity of service is a baseline expectation of the Company's customers.   Clients are highly reliant on "always-on" services and there is zero tolerance for service interruptions.

### *Assets*.

45.     The Company's primary assets consist of its proprietary software platforms, data analytics systems, and related intellectual property (the "IP Assets"), which underpin its valuation, tax, title, and data-driven software services.   The Company's IP portfolio comprises software code, patents, trademarks, proprietary databases and trade secrets.   These assets are protected through registrations in Canada and the U.S. and by employee and contractor confidentiality agreements. The IP Assets are primarily held through iLOOKABOUT Inc., Blue Water Financial Technologies, LLC, Appraisers Now Ltd, and Voxtur Analytics Corp., which host, license, and maintain the technology and data infrastructure used across the enterprise.   The Company intends to continue using these IP Assets in the ordinary course during these proceedings to preserve business continuity and stakeholder value.

46.     IP Assets represent a significant portion of the Company's enterprise value and are critical to any restructuring, sale, or going-concern outcome.   For this reason, the litigation proceedings described herein (which relate to the misappropriation of certain IP Assets) are critical to the Company's restructuring.

## B.     Creditors.

47.     As of March 31, 2025, on a consolidated basis, the Voxtur Group has total assets of approximately $44.6 million, and total liabilities of approximately $77.7 million.

48.     Pursuant to an amended and restated credit agreement dated September 21, 2022 (as amended from time to time) (the "BMO Credit Agreement") between Voxtur and

iLOOKABOUT (US) Inc., as borrowers, and Bank of Montreal ("BMO"), as lender, BMO agreed to make a number of credit facilities available to Voxtur (together, the "BMO Credit Facilities"), including (a) a revolving operating credit facility in the maximum amount of CAD $1,500,000; (b) a term loan facility in the maximum amount of CAD $20,500,000; (c) a Blue Water acquisition term loan in the maximum amount of USD $30,000,000; and (d) a MasterCard facility in the maximum amount of CAD $400,000.

49.     As security for the borrower's obligations, Voxtur and its material subsidiaries granted certain security interests, share pledges, guarantees, and assignments of contracts and intellectual property, in favor of BMO.

50.     The Voxtur Group defaulted under the BMO Credit Agreement on or about March 31, 2023.  The Company's account with BMO was escalated to the special loans department in the Fall of 2023 because of continued breaches of financial covenants.  In addition, the Company has been unable to service regularly scheduled payments of interest under the BMO Credit Agreement.

51.     Between April 2024 and July 2025, Voxtur entered into a number of Accommodation Agreements (the "Accommodation Agreements") whereby, among other things, BMO agreed to forbear from exercising its rights under the BMO Credit Agreement, and established a temporary revolving facility (the "Interim Revolving Facility") in the maximum amount of CAD $10,177,523.52 to fund the borrowers' shortfalls and working capital requirements, and the legal retainer and initial costs associated with pursuing the Dwelling Block Litigation (as defined below).

52.     On or about September 24, 2025, the HCP-FVY, LLC and HCP Fund V-FVY, LLC, affiliates of Hale Capital Partners (together, "Hale") purchased the BMO Credit Facilities from BMO (such transaction, the "Debt Assignment Transaction").  As a result of the Debt

Assignment Transaction, Hale is now the sole holder of all obligations owing by the Debtors under and in connection with the assigned BMO Credit Facilities and all related security documents, guarantees, collateral security and ancillary agreements (collectively referred to hereinafter as the "Prepetition Credit Facilities").

53.     Following the Debt Assignment Transaction, pursuant to the Second Amended and Restated Accommodation Agreement entered into in October 2025, a number of additional Voxtur Group entities were added as obligors and guarantors.  The effect is that all of the Debtors are jointly and severally liable in respect of the Prepetition Credit Facilities.

54.     As of the Petition Date, pursuant to the Prepetition Credit Facilities, the Debtors owe Hale the aggregate principal amount of $38,630,518.39, plus accrued and unpaid interest at the default rate with respect thereto and any additional fees, costs and expenses (including any fees and expenses of attorneys, financial advisors, and other professionals that are chargeable or reimbursable under the Prepetition Credit Facilities) now or hereafter due under the Prepetition Credit Facilities.

55.     The Company is current on its payroll and source deductions and Harmonized Sales Tax (HST).  The Company is also current on all source deductions and they are funded to the Debtors' payroll providers as part of the normal payroll cycle.

56.     The Company is current on its payroll and source deductions.  The Company owes approximately CAD $146,000 in unpaid deferred wages and unpaid vacation pay to certain terminated employees, and approximately CAD $1.4 million in deferred wages to current employees.

57.     The Voxtur Group's other creditors include unpaid trade and other unsecured debt accrued in the normal course of business.  These include unpaid accounts for technology services,

software subscriptions, logistics services, professional services, and other suppliers or service providers. As of November 7, 2025, the Debtors' accounts payable balances totaled approximately $4.2 million, attributable to approximately 100 vendors.

58.     Certain of the Debtors' critical service providers have recently imposed more stringent terms as a result of the Applicants' inability to promptly meet trade terms. Certain service providers have threatened to halt, or have halted services due to non-payment, and/or have escalated collection activities including the issuance of demand letters or threatened litigation.

## C.     Pending Litigation.

59.     The Debtors are involved in seven pending litigation proceedings; one in Canada, and six in the United States. Certain of these matters are particularly critical because they relate to the misappropriation of proprietary technology, and other matters directly affecting the value and protection of the Voxtur Group's assets. As described below, the outcomes of these proceedings are material to the Company's financial position and its ability to preserve and monetize its intellectual property portfolio.

### *Blue Water Litigation*.

60.     Voxtur and its subsidiary Blue Water Financial Technologies, LLC ("Blue Water FT") (and related Blue Water entities) have three matters pending in Minnesota and California, relating to a former founder of Blue Water, Alan Qureshi, and his wife, Ellen Qureshi (such litigation, the "Blue Water Litigation").

61.     In 2022, Voxtur purchased the holding company that owned the Blue Water business from Alan Qureshi and its other equity owners (the "Blue Water Acquisition") for approximately USD $30 million and the issuance of over 100 million common shares in Voxtur. The total consideration for the Blue Water Acquisition exceeded USD $100 million.

62.     Following the Blue Water Acquisition, Alan and Ellen Qureshi continued to serve as the President and Executive Vice President of Blue Water FT, respectively, until the two resigned in November 2024.

63.     The Voxtur Group's claim against Alan and Ellen Qureshi contains serious allegations against Alan, Ellen, and their new business, Black Lake Investments, LLC ("Black Lake").  In particular, just two years after selling Blue Water FT to Voxtur, and concurrently with their resignations in November 2024, Voxtur's claim in the Blue Water Litigation alleges that Alan and Ellen Qureshi formed Black Lake, a competing corporate entity, and proceeded to successfully solicit clients and employees from Blue Water FT to Black Lake.  It is alleged that Alan and Ellen Qureshi violated their non-compete agreements with Blue Water FT by soliciting Blue Water FT's customers and, through Black Lake, misappropriated trade secrets and confidential information.

### *Dwelling Blocks Litigation*.

64.     Voxtur, Appraisers Now Ltd., and Appraisers Now US, LLC are currently engaged in ongoing litigation in the United States District Court for the District of Delaware against several defendants, including Marty Haldane, Dwelling Blocks LLC, and associated parties (the "Dwelling Blocks Litigation").  The defendants in the Dwelling Blocks Litigation are former employees of Voxtur (and the ANOW entities).

65.     The Dwelling Blocks Litigation was commenced on or about June 16, 2025, and asserts claims for patent infringement under 35 U.S.C. § 271, copyright infringement, and related relief.  Voxtur and its related entities allege that the defendants unlawfully used and misappropriated proprietary software, systems, and intellectual property belonging to Voxtur in connection with Dwelling Blocks LLC ("Dwelling Blocks"), a competing real estate technology company.

66.     The defendants named in the action include former Voxtur associates and affiliated entities.  Voxtur's position is that these individuals and entities misappropriated confidential and proprietary information, including technology owned by Voxtur and its subsidiaries, to build and operate Dwelling Blocks, in violation of Voxtur's intellectual property rights.  The litigation is complex, involving both factual and technical issues regarding software architecture, valuation methodologies, and real estate data systems.

**D.     <u>Additional Challenges</u>.**

67.     In February 2021, iLOOKABOUT Corp. completed a significant merger with Voxtur Technologies, Brightline Title, and certain assets of James E. Albertelli, PA, and as part of the transaction changed its name and re-branded from iLOOKABOUT Corp. to Voxtur Analytics Corp.   Voxtur began trading under the new ticker symbol "VXTR".  At the time of the merger, the Company was profitable and growing rapidly.

68.     The 2021 merger was the beginning of a series of substantial acquisitions that transformed the Company in terms of service offerings.  After the merger, the Voxtur Group made six significant acquisitions in the span of only 16 months, including Blue Water FT in September 2022.

69.     While certain of these acquisitions were positive for the Company's growth and expansion, the Blue Water Acquisition precipitated a series of challenges which contributed to the financial distress and insolvency that the Company now faces.

70.     Blue Water is the Company's business division that provides technology solutions in the mortgage capital markets space.  The Blue Water business is entirely dependent on the use of specialized software that provides pricing, risk assessment, and other services in connection with mortgage trading.

71.     As described above, the Blue Water business was founded by Alan Qureshi, and Voxtur acquired the Blue Water business in September 2022 for approximately USD $101 million, comprised of USD $30 million and the issuance of over 100 million common shares in Voxtur. Significant debt had been taken on by the Company to fund the Blue Water Acquisition.

72.     Following the Blue Water Acquisition, Alan Quereshi and his wife Ellen Qureshi continued to serve on the management of Blue Water FT until they resigned in November 2024.

73.     Shortly after the acquisition, it became apparent that the Blue Water business was not performing as expected.  The Company is of the view, as described in detail in the Blue Water Litigation, that the business opportunity presented at the time of the Blue Water Acquisition was grossly misrepresented to Voxtur.  These issues culminated in the Blue Water Litigation described above, which alleges, among other things, violations of the Qureshis' non-compete agreements, tortious interference, breach of fiduciary duty, misappropriation of trade secrets (improper use of technology to solicit existing clients), and other allegations.

74.     In addition to the significant damages claimed, the Blue Water Litigation is critical to the Company and its ability to monetize its IP Assets.  The Company took on significant debt in order to complete the Blue Water Acquisition, and because of the events that underlie that litigation, there is a level of uncertainty surrounding the value of the acquired assets.

75.     In the summer of 2024, the Company engaged BMO Capital Markets to oversee efforts to market and solicit interest from prospective purchasers.  Marketing and sale efforts began in earnest in early 2025.  Multiple potentially interested parties were approached regarding the opportunity to invest in the Company.

76.     The Company received multiple indications of interest from potential purchasers in this process, particularly in respect of its ANOW division, with progress being made toward

achieving a sale of that business (the "ANOW Transaction").  Unfortunately, during the course of

due diligence, the potential purchaser developed concerns regarding the ownership of intellectual

property and proprietary technology.

77.    The intended purchaser ultimately declined to proceed with the ANOW

Transaction, at which point substantial resources and effort had already been expended in

furtherance of the proposed deal.  The loss of the ANOW Transaction (and loss of volume from a

significant client to Dwelling Blocks) factored into the commencement of the Dwelling Blocks

Litigation described above.

78.    The Company subsequently paused the pre-filing sale process, in favor of focusing

on other priorities, including advancing the litigation claims and working to address financial

difficulties and other challenges.

79.    In June 2024, Voxtur became the subject of a proxy contest initiated by a dissident

shareholder group known as "Voxtur Shareholders for Accountability" (the "Dissident Group").

The proxy contest intensified through the summer of 2024, with both sides issuing competing press

releases and open letters.  Ultimately, the shareholders voted against the Dissident Group's

proposal and the existing governance structure was preserved, putting an end to the proxy battle.

However, the battle inflicted a significant drain on the Company's resources, and deepened its

existing financial and operational challenges.

80.    The cumulative effect of these events has been severe; the various litigation

proceedings have not only imposed significant ongoing legal costs, but has also diverted

management attention away from core operations.  The litigation and resulting uncertainty have

impaired Voxtur's ability to attract new customers and investors and has had a material impact on

the value of Voxtur's IP Assets.  The collapse of the ANOW Transaction eliminated an important

source of liquidity and further strained cash flow. The 2024 proxy battle exacerbated the liquidity crisis, and increased advisory and professional fees by disrupting ongoing lender negotiations at a critical time. These factors, together with interest rate uncertainty, increasing buyer caution, and a consequent downturn in the housing market, have contributed to declining financial performance and the present inability to service debt obligations as they became due.

81.     The Company's account with BMO was escalated to the special account management unit (SAMU) at the bank in the Fall of 2023. Since that time, as a result of the Company's ongoing liquidity restraints, the Voxtur Group entered into a number of Accommodation Agreements with BMO, whereby BMO, among other things, provided additional funding for working capital requirements, including payroll, and agreed to forbear from exercising its rights under the BMO Credit Agreement and the BMO Security.

**E.      The Debt Assignment Transaction.**

82.     Hale was an interested party in the Company's pre-filing marketing and sales efforts. As indicated above, the Debt Assignment Transaction was completed in September 2025, whereby Hale acquired BMO's senior secured indebtedness. As a result of the Debt Assignment Transaction, Hale is the sole holder of all obligations owing by the Debtors under and in connection with the Prepetition Credit Facilities and related agreements.

83.     Since the Debt Assignment Transaction, certain events of default have occurred and are continuing under both the Prepetition Credit Facilities and the Accommodation Agreement. To prevent enforcement by Hale under the Prepetition Credit Facilities, the parties entered into a Second Amended and Restated Accommodation Agreement in October 2025. Pursuant to this agreement, the parties agreed, among other things, to: (a) amend certain provisions of the Prepetition Credit Facilities; (b) satisfy specific reporting requirements; and (c) have new

21

guarantor entities in the Voxtur Group's corporate structure agree to guarantee the payment of outstanding indebtedness arising from the Debt Assignment Transaction. The additional obligors under the Second Amended and Restated Accommodation Agreement executed security agreements in favor of Hale in connection with the guarantees. The Second Amended and Restated Accommodation Agreement confirmed the outstanding indebtedness owing to Hale as of October 1, 2025 in the principal sum of USD $36,908,103.61.

84.    The standstill period contemplated by the Second Amended and Restated Termination Agreement extended until October 31, 2025 at which point it terminated in accordance with its terms. The Debtors (as borrowers and obligors) are no longer the beneficiaries of any accommodations or standstills and are again in default without any current ability to service or repay the debt.

**F.    The Canadian Proceeding.**

85.    On November 10, 2025, the Debtors commenced a proceeding under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") in the Canadian Proceeding. *See* D.I. 1, Attachment No. 4 (Initial Canadian Order); *see also* Yeoman Decl. ¶ 48, Ex. A (Initial Canadian Order).

86.    The Initial Canadian Order expressly authorizes and empowers the Foreign Representative to act as a foreign representative and seek recognition of the Canadian Proceeding pursuant to Chapter 15 in this Court, for example:

> 52.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Applicants, the Monitor, and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this

Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Applicants in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order, including Applicant Voxtur Analytics Corp., as the foreign representative for all Applicants (the "Foreign Representative"), to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the United States Bankruptcy Code, Title 11, United States Code, 11 U.S.C. § 1501 et seq. The Foreign Representative is empowered and authorized, but not obligated, to commence one or more foreign legal proceedings to further the objectives of this proceeding, including by way of example and not limitation, ancillary insolvency proceedings in the United States of America, proceedings under the Model Law on Cross-Border Insolvency (including Chapter 15 of the United States Bankruptcy Code, Title 11, United States Code, 11 U.S.C. § 1501 et seq.), petitions under Title 11, United States Code, Chapters 7 and 11, as well as any other foreign legal proceedings wherever required to be filed by the Foreign Representative in its judgment to pursue recovery of, protect and maintain, or dispose of the Applicants' property.

53.     THIS COURT ORDERS that the Foreign Representative be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Foreign Representative is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

*See* Initial Canadian Order at ¶¶ 52-53.

87.     The Debtors are seeking CCAA protection and ancillary protection under Chapter 15 of the Bankruptcy Code at this time due to the Company's significant liquidity challenges. The relief requested in both proceedings will stabilize the business and provide Voxtur with an opportunity to address its current challenges and produce a value-maximizing outcome for the benefit of its stakeholders.

88.    The filing for protection under the CCAA and Bankruptcy Code, and the proposed relief sought, are supported by the Company's senior secured creditor and proposed DIP Lender. There are no other secured creditors of the Company.

## G.    The DIP Facility.

89.    Hale is the Voxtur Group's only pre-petition secured creditor, as Hale is the sole holder of all obligations owing by the Debtors under and in connection with the Prepetition Credit Facilities.  *See*, *e.g.*, Initial Canadian Order at Endorsement ¶¶ 26, 42 (finding that Hale is "the only registered secured creditor" of the Debtors, and "the outstanding indebtedness owing to Hale as of October 1, 2025 [is] the principal sum of USD $36,908,103.61").  As discussed above, the Prepetition Credit Facilities are guaranteed by each material subsidiary of Voxtur, and secured by valid and perfected liens on substantially all of the Voxtur Group's assets, including without limitation all present and after-acquired personal property expressly including litigation claims, pledges of the ownership interests in subsidiaries, and assignments of material contracts and intellectual property rights (collectively, the "Collateral").

90.    Hale, as the DIP Lender, has agreed to provide the Debtors with a post-petition credit facility (collectively, the "DIP Facility") in the final principal amount of up to $2,350,000, pursuant to the DIP Facility Term Sheet dated as of November 7, 2025 (the "DIP Term Sheet"). *See* Yeoman Decl. ¶ 110, Ex. B (DIP Term Sheet).

91.    The purpose of the DIP Facility is to fund the Company's essential working capital needs and professional fees and expenses through the expected duration of the Canadian Proceeding and these Chapter 15 Cases.

92.    Among other things, the DIP Term Sheet provides for the DIP Lender's review and approval of an initial thirteen-week rolling cash projection budget and weekly updates thereof

(collectively, the "DIP Budget") for the Debtors to use the DIP Facility advances and cash collateral (collectively, "Cash Collateral") in compliance with the approved DIP Budget and the terms of the DIP Term Sheet. *See* Yeoman Decl. ¶ 112, Ex. C (initial DIP Budget).

93.    The Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral, solely to the extent and for the purposes permitted in the approved DIP Budget to, among other things, (A) permit the orderly continuation of their businesses; and (B) pay the costs of administration of their estates and satisfy other working capital and general corporate purposes of the Debtors. The DIP Facility also provides a mechanism for the DIP Lender to fund the offensive litigation claims brought by the Debtors, which the Debtors believe have significant value. The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations under the DIP Facility is vital to the preservation and maintenance of the Debtors' going concern value and successful restructuring process. The Debtors will not have sufficient sources of working capital and financing to operate their businesses in the ordinary course of business throughout the Canadian Proceeding and these Chapter 15 Cases without access to the DIP Facility and the authorized use of Cash Collateral. The Company does not have sufficient liquidity to continue normal course operations during the DIP Budget period in the absence of the DIP Facility. Absent the DIP Facility, the Debtors will very shortly become unable to meet their obligations as they become due.

94.    As discussed above, the Debtors' ordinary course cash expenditures exceed their cash receipts. The periods of relief and forbearance extended pursuant to the series of accommodation agreements are no longer available. Based on the DIP Budget, the Debtors will

have insufficient cash to sustain operations through the week ending November 21, 2025, absent the DIP Facility.

95.     The Debtors, the DIP Lender, the monitor in the Canadian Proceeding,[2] and their respective advisors, analyzed the amount of funding necessary to maintain the Company's business operations and to fund the Canadian Proceeding and these Chapter 15 Cases, and negotiated and structured the DIP Facility and DIP Budget to satisfy the Company's projected post-petition funding needs.  The DIP Facility and DIP Budget are the product of good faith, arms' length negotiations by and between the Debtors and the DIP Lender, as well as their respective advisors and counsel.

96.     The terms and conditions of the DIP Facility and the use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the monitor in the Canadian Proceeding, and the DIP Lender, with the assistance of their respective counsel and advisors.  The DIP Lender has consented to the use of Cash Collateral pursuant to the DIP Budget and DIP Term Sheet in good faith.

**H.     <u>Priming Liens</u>.**

97.     The availability of the advances under the DIP Facility is subject to and conditional upon, among other things, approval in the Canadian Proceeding and these Chapter 15 Cases, respectively, of the DIP Facility, and certain priming liens approved by the DIP Lender on the

---

[2] "In a CCAA proceeding, absent exceptional circumstances, a debtor's management and board of directors remain in place.  But the court also appoints a qualified monitor, who functions as an independent court officer and observer of the CCAA proceeding and of the debtor's business, and who monitors the company's ongoing operations, and reports to the court on any major events affecting the company."  *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 611 (Bankr. S.D.N.Y. 2017); *see also In re Asbestos Corp. Ltd.*, Case No. 25-10934 (MG), 2025 WL 3023332, at *12 (Bankr. S.D.N.Y. Oct. 29, 2025) (In a CCAA proceeding, the monitor is "the independent officer appointed by the Canadian Court to provide objective oversight and ensure the restructuring is fair and impartial to all stakeholders.").

terms set forth in the DIP Term Sheet (collectively, the "Priming Liens"), subject to the following

priorities: *first*, the Administrative Liens; *second*, the DIP Liens, and *third*, the D&O Liens:

a. *Administrative Liens*. As security for the professional fees and

disbursements of the Foreign Representative's and Debtors' Canadian and U.S. counsel and the

monitor appointed in the Canadian Proceeding and the monitor's counsel (collectively, the

"Professionals"), the Professionals shall be granted valid, binding, enforceable, non-avoidable, and

automatically and properly perfected liens and security interests (collectively, the "Administrative

Liens") in all Collateral, in each case, senior to all other liens or claims; *provided, however,* the

Administrative Liens shall secure the maximum aggregate amount of $280,000 on an interim basis,

and $450,000 on a final basis. It is contemplated that the Professionals will have extensive

involvement during the Canadian Proceeding and these Chapter 15 Cases. The Professionals have

contributed and will continue to contribute to the Debtors' restructuring efforts.

b. *DIP Liens*. As security for any and all obligations arising under or related

to the DIP Facility (collectively, the "DIP Obligations"), the DIP Lender shall be granted valid,

binding, enforceable, non-avoidable, and automatically and properly perfected liens and security

interests (collectively, the "DIP Liens") in all Collateral, in each case, subject and subordinate to

only the Administrative Liens.

c. *D&O Liens*. As security for the indemnity granted by the Debtors to their

directors and officers ("D&Os") relating to personal liability for unpaid employee liabilities or tax

liabilities under which directors and officers can be held liable under Canadian law, the D&Os

shall be granted valid, binding, enforceable, non-avoidable, and automatically and properly

perfected liens and security interests (collectively, the "D&O Liens") in all Collateral, in each case,

subject and subordinate to only the Administrative Liens and the DIP Liens; *provided, however,*

the D&O Liens shall secure the maximum aggregate amount of $620,000 on an interim and final basis.  To ensure the ongoing stability of the Debtors' business during the Canadian Proceeding and these Chapter 15 Cases, the Debtors require the continued participation of the D&Os who manage their business and activities.  The D&Os of the Debtors have considerable institutional knowledge and valuable experience regarding the various business divisions of the Debtors.

**I.      Alternative Financing Is Not Possible.**

98.     As discussed above, the DIP Lender is the Debtors' pre-petition secured creditor, as the sole holder of all obligations owing by the Debtors under and in connection with the Prepetition Credit Facilities and related agreements.

99.     The DIP Lender is willing to extend post-petition financing to the Debtors, whereas the Debtors would not be able to find an alternative post-petition financing source because all potential post-petition lenders would require priming liens, which would not be acceptable to the DIP Lender.  There is an insufficient equity cushion, if any, behind the DIP Lender to prime over its objection.

100.    The DIP Facility is the best source of debtor-in-possession financing available to the Debtors at this time.  Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtors would be unable to obtain (i) adequate unsecured credit allowable either under 11 U.S.C. §§ 364(b) and 503(b)(1), or under 11 U.S.C. § 364(c)(1), (ii) adequate credit secured only by a senior lien on unencumbered assets of their estates under 11 U.S.C. § 364(c)(2), and a junior lien on encumbered assets under 11 U.S.C. § 364(c)(3), or (iii) secured credit under 11 U.S.C. § 364(d)(1) from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility.  The only

viable source of post-petition credit available to the Debtors is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral to satisfy their post-petition liquidity needs.

**J.      DIP Facility Approval in the Canadian Proceeding.**

101.    By entry of the Initial Canadian Order, the DIP Facility, and related DIP Budget and Priming Liens, has already been approved in the Canadian Proceeding on an initial basis. *See* Initial Canadian Order ¶¶ 30-42. The Foreign Representative anticipates that the DIP Facility will be approved on a final basis in the Canadian Proceeding on November 20, 2025.

102.    The Foreign Representative is seeking the same interim and final relief related to the DIP Facility in the Canadian Proceeding and in these Chapter 15 Cases, in the final principal amount of up to $2,350,000 pursuant to the same approved DIP Budget.

## RELIEF REQUESTED

103.    The Foreign Representative respectfully requests entry of the proposed order, attached hereto as Exhibit A (the "Recognition Order"), recognizing the Canadian Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. §§ 1517(b)(1) and 1502(4) and granting additional relief pursuant to 11 U.S.C. § 1521.

104.    This Verified Petition relies upon the Form Petition and attachments thereto [D.I. 1], the Declaration of Gary Yeoman and exhibits thereto ("Yeoman Decl.") filed concurrently herewith, and the other papers and pleadings filed in this matter.

105.    Notwithstanding the worldwide application of the stay imposed by the CCAA, there is a risk the Debtors' U.S.-based assets, including equity interests, operating assets, intellectual property, and pending litigation claims, may be subject to enforcement actions by the Debtors' creditors; sold or otherwise transferred without the Foreign Representative's consent, notice to

creditors, or Canadian/U.S. court oversight; inadequately protected and insured; or otherwise interfered with by third parties while the Foreign Representative is attempting to investigate, preserve, and administer the Debtors' estates.

106.    To protect against these risks, the Foreign Representative commenced these Chapter 15 Cases by filing the Petition pursuant to 11 U.S.C. §§ 1504, 1509(a), and 1515(a), and now the Foreign Representative respectfully petitions this Court for entry of the Recognition Order granting the following relief:

    i.   Recognizing the Canadian Proceeding as a "foreign main proceeding" as defined in 11 U.S.C. §§ 1502(4) and 1517(b)(1).

    ii.   Granting the Foreign Representative the relief afforded under 11 U.S.C. § 1520, as is provided by right upon the recognition of the Canadian Proceeding as a foreign main proceeding, including:

        a.   Applying 11 U.S.C. §§ 361 and 362 with respect to the Debtors and the Debtors' property within the territorial jurisdiction of the United States;

        b.   Applying 11 U.S.C. §§ 363, 549, and 552 to a transfer of an interest of the Debtors in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate under another chapter;

        c.   Authorizing the Foreign Representative to operate the Debtors' businesses and exercise the rights and powers of a trustee under and to the extent provided by 11 U.S.C. §§ 363 and 552; and

        d.   Applying 11 U.S.C. § 552 to property of the Debtors that is within the territorial jurisdiction of the United States.

    iii.   To the extent not granted by 11 U.S.C. § 1520, granting further additional relief as authorized by 11 U.S.C. § 1521(a) including:

        a.   Staying the commencement or continuation of an individual action or proceeding concerning the Debtors' assets, rights, obligations or liabilities to the extent they have not been stayed under 11 U.S.C. § 1520;

    b.   Staying execution against the Debtors' assets to the extent it has not been stayed under 11 U.S.C. § 1520;

    c.   Suspending the right to transfer, encumber, or otherwise dispose of any assets of the Debtors to the extent this right has not been suspended under 11 U.S.C. § 1520;

    d.   Providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the Debtors' assets, affairs, rights, obligations, or liabilities;

    e.   Entrusting the administration or realization of all of the Debtors' assets within the territorial jurisdiction of the United States to the Foreign Representative;

    f.   Extending relief granted under 11 U.S.C. § 1519(a); and

    g.   Incorporating 11 U.S.C. § 364 into these Chapter 15 Cases, and on a final basis, (i) authorizing the Debtors to obtain post-petition financing in the aggregate amount of up to $2,350,000; (ii) authorizing the Debtors to enter into the DIP Term Sheet and to perform such other and further acts as may be necessary or appropriate in connection with the DIP Facility, including the Priming Liens and charges provided therein and approved by the Initial Canadian Order; and (iii) authorizing the Debtors to use the proceeds of the DIP Facility and Cash Collateral upon the terms and conditions set forth in the DIP Term Sheet and the DIP Budget.

## LEGAL ANALYSIS

**A.**    **The Canadian Proceeding Should Be Recognized as a Foreign Main Proceeding.**

107.    The Canadian Proceeding should be recognized as a foreign main proceeding because (i) the Canadian Proceeding is pending in the country where the Debtors' center of main interest is located; (ii) the Canadian Proceeding is a foreign proceeding within the meaning of 11 U.S.C. § 101(23); (iii) the Foreign Representative is a foreign representative within the meaning of 11 U.S.C. § 101(24); and (iv) all other requirements for Chapter 15 recognition are satisfied by the Petition.

### *The Debtors' Center of Main Interests (COMI) Is Located in Canada*.

108.    The foreign proceeding for which recognition is sought must be either a foreign main proceeding or a foreign non-main proceeding within the meanings proscribed under 11 U.S.C. § 1502.  11 U.S.C. § 1517(a)(1).  A "foreign main proceeding" is a foreign proceeding pending in the country where the debtor has its center of its main interests ("COMI").  11 U.S.C. §§ 1502(4) & 1517(b)(1).  Therefore, because the Canadian Proceeding is pending in Canada, for the Canadian Proceeding to qualify as a "foreign main proceeding," the Debtors' COMI must be located in Canada.  *See*, *e.g.*, *In re Chiang*, 437 B.R. 397, 403 (Bankr. C.D. Cal. 2010) ("To qualify the foreign proceeding as a foreign main proceeding, [the foreign representative] must show that debtor's COMI is located in Canada.").

109.    Every debtor must have exactly one COMI, and it must be in a specific country.  *Id*. While COMI is not explicitly defined in the Bankruptcy Code, in the absence of evidence to the contrary, there is a presumption that a debtor's COMI is the debtor's "registered office."  11 U.S.C. § 1516(c).  Courts consider the following nonexclusive factors when determining a debtor's COMI:  (1) the location of the debtor's headquarters; (2) the location of those who manage the debtor; (3) the location of the debtor's primary assets; (4) the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and (5) the jurisdiction whose law would apply to most disputes.  *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd,* 371 B.R. 10 (S.D.N.Y. 2007).  Courts do not apply these factors "mechanically"; rather, "they should be viewed in light of chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value," and to that end, Courts "generally should defer, therefore, to the creditors' acquiescence in or support of a proposed COMI."  *Id*.

110.    Voxtur Analytics Corp., Appraisers Now Ltd., Municipal Tax Equity Consultants Inc., MTAG Paralegal Professional Corporation, and MTE Paralegal Professional Corporation (collectively, the "Canadian Debtors") are corporations registered in Canada (Ontario or Alberta). Yeoman Decl. ¶ 11.  Therefore, it is presumed that the COMI for the Canadian Entities is located in Canada.  11 U.S.C. § 1516(c).

111.    Although Voxtur Analytics US Corp., Blue Water Financial Holding Company, LLC, Blue Water Financial Technologies, LLC, Blue Water Financial Technologies Services, LLC, Appraisers Now US, LLC, Clarocity Inc., iLOOKABOUT (US) Inc., Voxtur Settlement Services, LLC, Voxtur Settlement Services of Alabama, LLC, Voxtur Settlement Services of Arkansas, LLC, Voxtur Title Agency, LLC, Legend Title Company, LLC, Commonwealth USA Settlements, LLC, Voxtur Technologies US, Inc., Orange & Blue Holdings 3.0, LLC, Orange & Blue Holdings 4.0, LLC, Orange & Blue Holdings 5.0, LLC, Valuation Vision Inc., and Voxtur Valuation, LLC (collectively, the "American Debtors") are corporations registered in the United States (Delaware, Minnesota, Florida, Alabama, Arkansas, Colorado, Pennsylvania, California, or Kansas), their COMI is located in Canada because the American Debtors are all part of an integrated business that has its center of main interests in Ontario, including (a) Voxtur, the Company's ultimate publicly-traded parent company (which wholly owns and/or controls all of the subsidiaries) is domiciled in Canada; (b) Voxtur's public company regulatory requirements are governed by Canadian securities laws; (c) the Company's material lending agreements are governed by Ontario and Canadian law; (d) material financial and strategic management is headquartered in Ontario, and key decision-making is located in Ontario; (e) the Company's auditors, corporate counsel, and board of directors are all Canadian and domiciled in Canada; (f) the majority of the Company's employees and the majority of executive management are

located in Canada; and (g) supplier and customer relations are managed from Ontario. There is

substantial corporate interdependence among all entities in the Company's corporate structure

including with respect to finance, information technology, human resources, and legal functions.

*See*, *e.g.*, Yeoman Decl. ¶¶ 11, 104-105. The Debtors' primary banking relationship is in Canada,

their primary secured obligations originated from a Canadian lender (BMO), and their senior

secured creditor (Hale) supports recognition of Canada as the COMI for all Debtors. Creditor

support for Canadian COMI for all Debtors, so as to recognize the Canadian Proceeding as the

main proceeding for all Debtors, is further evidenced by the Initial Canadian Order itself, which

not only applies to all Debtors equally under one jointly-administered Canadian Proceeding, but

also includes express provisions intended to empower the Foreign Representative to seek

recognition and ancillary relief for the Canadian Proceeding in this Court pursuant to Chapter 15.

*See* Initial Canadian Order at ¶¶ 52-53. Therefore, there is ample evidence that the COMI for all

of the Debtors, including the American Entities, is located in Canada. *See*, *e.g.*, *In re SPhinX, Ltd.*,

351 B.R. at 117 (considering location of management and location of major creditors as important

factors for determining COMI); *In re OAS S.A.*, 533 B.R. 83, 101–02 (Bankr. S.D.N.Y. 2015)

(finding that a subsidiary's COMI is with its parent's COMI when the subsidiary is a holding

company wholly-owned and controlled by its parent).

### *The Canadian Proceeding Is a Foreign Proceeding.*

112.    The Bankruptcy Code defines a "foreign proceeding" as "a collective judicial or

administrative proceeding in a foreign country, including an interim proceeding," that is pending

"under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs

of the debtor are subject to control or supervision by a foreign court, for the purpose of

reorganization or liquidation." 11 U.S.C. § 101(23). The Canadian Proceeding is "a collective

34

judicial or administrative proceeding in a foreign country, including an interim proceeding" because it is a pending insolvency proceeding in Canada.

113.    The Canadian Proceeding is a judicial proceeding commenced under the CCAA. The CCAA is among Canada's primary laws relating to insolvency.  *See* Jacob S. Ziegel, *Corporate Groups and Crossborder Insolvencies: A Canada - United States Perspective*, 7 Fordham J. Corp. & Fin. L. 367, 373 (2002) ("Canada has two quite distinct commercial reorganizational regimes" including "the 'creditors' arrangements' regime found in the Companies' Creditors Arrangements Act.").  In a CCAA proceeding, "a debtor's management and board of directors remain in place," and "the court also appoints a qualified monitor, who functions as an independent court officer and observer of the CCAA proceeding and of the debtor's business, and who monitors the company's ongoing operations, and reports to the court on any major events affecting the company."  *In re U.S. Steel Can. Inc.*, 571 B.R. 600, 611 (Bankr. S.D.N.Y. 2017) (holding that "the CCAA Proceeding satisfies the requirements of a foreign main proceeding under the Bankruptcy Code.")

114.    This Court and others routinely recognize Canadian CCAA proceedings as foreign main proceedings.  *See, e.g.*, *In re Goli Nutrition Inc.*, Case No. 24-10438 (LSS), 2024 WL 1748460, at *2 (Bankr. D. Del. Apr. 23, 2024) ("CCAA proceedings are consistently recognized by courts in the United States"); *In re U.S. Steel Canada Inc.*, 571 B.R. at 611 ("This Court and others have recognized that a Canadian CCAA restructuring proceeding can constitute a 'foreign proceeding.'") (collecting cases).

### *Voxtur Analytics Corp. Is a Foreign Representative*.

115.    The foreign representative applying for recognition of the foreign proceeding must be "a person or a body . . . authorized in a foreign proceeding to administer the reorganization or

the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. §§ 101(24) & 1517(a)(2).

116.    As a corporation, Voxtur Analytics Corp., in its capacity as the Foreign Representative, qualifies as a "person." 11 U.S.C. § 101(41).

117.    The Initial Canadian Order entered in the Canadian Proceeding appointing Voxtur Analytics Corp. as the Foreign Representative expressly authorizes and empowers the Foreign Representative to administer the Debtors' estates and to act as a foreign representative to commence these Chapter 15 Cases.  *See* Initial Canadian Order at ¶¶ 52-53.  To that end, the Foreign Representative is petitioning for Chapter 15 recognition of the Canadian Proceeding, and immediate provisional relief, to protect and preserve the value of the Debtors' equity interests, operating assets, intellectual property, pending litigation claims, and the Debtors' other assets located in the United States, then administer those assets in accordance with applicable Canadian and United States law for the benefit of all creditors.  *See* 11 U.S.C. § 1501 (Chapter 15's purpose and objectives include "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors" and "protection and maximization of the value of the debtor's assets").

118.    Courts routinely rely on foreign court orders to identify the appropriate foreign representative for purposes of Chapter 15.  *See, e.g.*, *In re U.S. Steel Canada Inc.*, 571 B.R. at 612 ("Here, the Canadian Court has authorized USSC, a corporation, to act as foreign representative and to apply for recognition of the CCAA Proceeding in this Court pursuant to the Authorization Order.  Accordingly, USSC is qualified to be the foreign representative.")

119.    Therefore, under the Initial Canadian Order, the Foreign Representative qualifies as a foreign representative authorized to act in these Chapter 15 Cases; and solely in that capacity as foreign representative and pursuant to the authority and powers granted in the Initial Canadian

Order, the Foreign Representative is now petitioning this Court for Chapter 15 recognition of the Canadian Proceeding.

### ***The Petition Satisfies All Requirements for Recognition***.

120.    Chapter 15 of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Rules") impose certain procedural requirements for Chapter 15 recognition of any foreign proceeding.  The Foreign Representative has satisfied all of those requirements in these cases.  The Foreign Representative commenced these Chapter 15 Cases by filing the Petition in the appropriate United States Bankruptcy Court.  *See* 11 U.S.C. §§ 1504, 1509(a), & 1515(a); *see also* D.I. 1.  The Petition is accompanied by:

> i.    A corporate ownership statement containing the information described in Rule 7007.1.  Fed. R. Bankr. P. 1007(a)(4)(A); *see* D.I. 1, Attachment 1 (Corporate Ownership Statement);
>
> ii.    A statement identifying all foreign proceedings with respect to the Debtors that are known to the foreign representative.  11 U.S.C. § 1515(c); *see* D.I. 1, Attachment 2 (Section 1515(c) Statement);
>
> iii.    A list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under Section 1519 of the Bankruptcy Code.  Fed. R. Bankr. P. 1007(a)(4)(B); *see* D.I. 1, Attachment 3 (Chapter 15 List); and
>
> iv.    The Initial Canadian Order establishing "the existence of such foreign proceeding and the appointment of the foreign representative."  11 U.S.C. § 1515(b)(3); *see* D.I. 1, Attachment 4 (Initial Canadian Order).

121.    This Verified Petition "state[s] the country where the debtor has its center of main interests" is Canada.  Fed. R. Bankr. P. 1004.2(a); *see supra*.

122.    The appropriate parties in interest will receive "at least 21 days' notice by mail" of the hearing on the Petition.  Fed. R. Bankr. P. 2002(q)(1); Local Bankr. R. 2002-1(b)(6).  Concurrently with filing the Petition, by separate motion, the Foreign Representative is requesting

an expedited hearing to schedule the recognition hearing on the Petition, and to approve the

Foreign Representative's proposed form of notice and manner of service of the Petition and

recognition hearing (and any provisional relief that the Court may grant for the interim period), for

the Foreign Representative to mail such notice to the appropriate parties pursuant to Rule 2002(q)

and Local Bankruptcy Rule 2002-1(g).

123.    Counsel for the Foreign Representative contacted the U.S. Trustee and the Clerk of

the Court two business days before filing the Petition to advise of the anticipated filing and the

immediate relief the Foreign Representative is seeking.  Local Bankr. R. 1002-1.

**B.    Related Relief Under 11 U.S.C. §§ 1520 and 1521.**

124.    Upon recognition of the Canadian Proceeding as a foreign main proceeding, the

relief listed under 11 U.S.C. § 1520(a) will be granted automatically by function of statute.  11

U.S.C. § 1520(a).  In addition to that automatic relief upon "foreign main proceeding" recognition,

11 U.S.C. § 1521 authorizes bankruptcy courts to grant "appropriate" discretionary relief "where

necessary to effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the

interests of the creditors," including:

(a)(1)   staying the commencement or continuation of an individual action or
proceeding concerning the debtor's assets, rights, obligations, or liabilities
to the extent they have not been stayed under section 1520(a);

(a)(2)   staying execution against the debtor's assets to the extent it has not been
stayed under section 1520(a);

(a)(3)   suspending the right to transfer, encumber, or otherwise dispose of any
assets of the debtor to the extent this right has not been suspended under
section 1520(a);

(a)(4)   providing for the examination of witnesses, the taking of evidence, or the
delivery of information concerning the debtor's assets, affairs, rights,
obligations, or liabilities;

(a)(5)   entrusting the administration or realization of all or part of the debtor's

assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(a)(6)    extending relief granted under section 1519(a); and

(a)(7)    granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

…

(b)      entrust[ing] the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.

11 U.S.C. § 1521(a)-(b).  The relief under 11 U.S.C. § 1521(a) subsections (1), (2), (3), and (6) requires the application of standards for injunctive relief.  11 U.S.C. § 1521(e).

125.    The "injunction" standard includes four factors:  (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm; (3) that the balance of equities tips in the movant's favor, and (4) that the relief is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  All four factors weigh in favor of entering the Recognition Order granting relief under 11 U.S.C. § 1521.

126.    *First*, there is a substantial likelihood that with the relief granted in the Recognition Order, the Foreign Representative will be able to successfully administer the Debtors' assets under the provisions of the Bankruptcy Code in these Chapter 15 Cases, and under the CCAA and the Canadian Order in the Canadian Proceeding, which will benefit all creditors.  Under the CCAA, the general purpose of the Canadian Proceeding is to administer the Debtors' assets for the benefit of creditors, under the supervision of a court-appointed monitor.  The relief available under 11 U.S.C. § 1521 will compliment that purpose and fully empower the Foreign Representative, as Chapter 15 intends.

127.     *Second*, there is a substantial threat of irreparable harm to the Debtors' estates and creditors if the relief under 11 U.S.C. § 1519 is not granted.  *See In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 181 (Bankr. S.D.N.Y. 2022) ("irreparable harm exists when local actions could hinder the orderly process of a foreign proceeding and the goal of fair distribution of assets").  The Debtors are struggling with operational continuity and cash flow while also engaging in litigation involving multiple counterparties across multiple jurisdictions, which necessitate heightened Chapter 15 relief to ensure the status quo is maintained with respect to the Debtors' U.S.-based assets while the Foreign Representative seeks formal recognition of the Canadian Proceeding in this Court and ultimately administers the Debtors' estates under Canadian and United States law, as applicable.  Yeoman Decl. ¶¶ 90-96.

128.     *Third*, the threatened injury to the Debtors' estates and creditors outweighs any damage the relief set forth herein might cause to third parties.  The injunctive relief sought by the Foreign Representative will benefit the Debtors' creditors by maximizing the value of the Debtors' assets, ensuring an equitable and orderly distribution of assets, and facilitating the Canadian Proceeding.  The provisional and discretionary relief sought by the Foreign Representative will benefit the Debtors' creditors by maintaining and maximizing the value of the Debtors' assets within the United States—particularly its operating assets, intellectual property, and pending litigation claims—and will ensure an equitable and orderly distribution of assets as required by the CCAA and Chapter 15.  The balance of the harms strongly favors granting the relief under 11 U.S.C. § 1521 requested by the Foreign Representative.

129.     *Fourth*, the injunctive relief is in the public interest.  It is necessary to facilitate a cross-border reorganization that will provide a benefit to the Debtors' estates and all creditors. The injunctive relief is supported by notions of comity and will allow the Foreign Representative

to preserve the Debtors' assets and maximize value for the Debtors' estate. *See* 11 U.S.C. § 150l(a) (purpose of Chapter 15 includes "fair and efficient administration of cross-border insolvencies" and "protection and maximization of the value of the debtor's assets"); *see also Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").

130.     The relief available under 11 U.S.C. § 1521(a)(7) includes "any additional relief that may be available to a trustee, except for relief available under 11 U.S.C. §§ 522, 544, 545, 547, 548, 550, and 724(a)."  On that basis, the Foreign Representative is requesting that the Recognition Order incorporate 11 U.S.C. § 364 into these Chapter 15 cases, and approve the DIP Facility, DIP Budget, and Priming Liens on a final basis.  This relief is also supported by principles of comity, as the DIP Facility, DIP Budget, and Priming Liens have already been approved in the Canadian Proceeding and are intended to mirror and give full effect to that relief.  11 U.S.C. § 1507(b); *see also*, *e.g.*, Initial Canadian Order ¶¶ 30-42.

131.     The DIP Term Sheet also contemplates that Hale and the Debtors intend to enter into a stalking horse agreement for consideration in the Canadian Proceeding and these Chapter 15 Cases in the near future, and, with respect to any credit bid under 11 U.S.C. § 363(k), Hale will have the right to "credit bid" the full amount of all pre-and post-petition obligations. *See*, *e.g.*, DIP Term Sheet § 21(f), (i).  Hale's ability to credit bid will benefit the estates by providing a floor for bidding and a path forward through an actionable sale if ultimately selected as the successful bidder.

**NOTICE**

132.     The Foreign Representative will provide notice of the Petition to all parties listed on the provisional relief service list pursuant to Rule 1007(a)(4)(B), which includes all the parties entitles to notice under Rule 2002(q)(1), and the Foreign Representative will provide additional notice as directed by the Court.  To that end, by separate motion filed concurrently with this Petition, the Foreign Representative is seeking expedited approval of the form of notice and manner of service, as well as a date, time, and location for the recognition hearing on the Petition.

**CONCLUSION**

133.     For these reasons, the Foreign Representative respectfully requests that the Court enter the Foreign Representative's proposed Recognition Order attached hereto as Exhibit A.

Dated:  November 11, 2025
       Wilmington, Delaware

**BALLARD SPAHR LLP**

By */s/Laurel D. Roglen*
Laurel D. Roglen, Esq. (DE No. 5759)
James B. Zack, Esq. (*Pro Hac Vice Pending*)
919 North Market Street, 11th Floor
Wilmington, DE 19801
Telephone:  (302) 252-4465
E-mail:  roglenl@ballardspahr.com
E-mail:  zackj@ballardspahr.com

*Counsel for the Foreign Representative*